IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:15-CR-301-BO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )     O R D E R |
| | ) |
| SIPRIANO MORELES-ALBEAR. | ) |

This matter comes before the Court on defendant's motion to suppress any and all evidence, including any statements, obtained by law enforcement officers incident to defendant's warrantless arrest. The government responded in opposition, and the matter is ripe for ruling. Hearings were held on this issue at Raleigh, North Carolina, on June 23, 2016, and again on July 21, 2016. At both hearings, Special Agent Stephen Farina of the Federal Bureau of Investigation (FBI) testified for the government and was the only witness. For the reasons discussed below, defendant's motion to suppress is GRANTED. [DE 43].

## BACKGROUND

This case concerns events that took place on September 19, 2015, in Cary, North Carolina. Three days prior, a known informant in New Mexico informed authorities there of a dark Nissan Altima which was traveling through the area carrying an unknown quantity of drugs. The informant gave the name and license plate number of the Altima. That night, the Altima was stopped by law enforcement in New Mexico. It was found to contain approximately nineteen kilograms of cocaine. The car's driver had been hired by a broker to drive the Altima to Raleigh, North Carolina. The driver (hereinafter referred to as "cooperating witness") agreed to cooperate with law enforcement in a controlled delivery of the cocaine to its destination.

The controlled delivery was coordinated between FBI agents in New Mexico and North Carolina. The agents in North Carolina obtained an Altima similar in appearance to the one stopped in New Mexico, placed the original Altima's license plate on it, and placed sham cocaine in the trunk. The New Mexico FBI agents and cooperating witness traveled to North Carolina for the controlled delivery, which was to take place on September 19, 2015.

That morning, the FBI monitored conversations between the cooperating witness and the broker, though the testifying agent was never with the cooperating witness during her communications with the broker, so the Court is not clear as to the precise nature of all communications between the two. Nevertheless, that day the cooperating witness informed the broker that the car was parked at a La Quinta Inn. This was a location selected by the FBI. The broker told the cooperating witness to drive the car to another location, but the cooperating witness refused, at first saying she was tired from the long drive. Eventually, after consulting with the agents, the cooperating witness then told the broker that the car would not start. The FBI agents disabled the car and placed the key under or on[1] the driver side floor mat. At some point in the exchange, the cooperating witness text messaged a picture of the location of the La Quinta to the broker. The agent testified that the discussion about where the meeting place should be created a time delay of several hours between initial communications and when someone arrived at the vehicle.

In the affidavit in support of the criminal complaint in this case, Special Agent Stephen Farina testified "[a]t approximately the same time that [defendant and the other man] entered the parking lot . . . the broker advised [the cooperating witness] that the individuals who were going

---

[1] Affidavit and hearing testimony from Special Agent Farina differs on this point, but, as there was no evidence that the key (to be discussed more, *infra*) played a role in the arrest decision, this is a distinction without a difference.

2

to pick up the black 2012 Nissan Altima bearing New Mexico license plate 213 TCS that at been loaded with narcotics were at the vehicle." [DE 1]. At the first hearing, Special Agent Farina testified that "around approximately 1:45 or 1:50 p.m., radio communication advised me that the cooperator had been told by the broker that they are there." [DE 53]. Special Agent Farina then testified that there may have been some communication about what the people coming to the La Quinta were driving or what they were doing but that, if there was, it was unintelligible.[2] *Id.* The Court takes this to mean this information—whatever it was—was not a factor in the agents' decision to arrest. At around the same time of this communication—though it is unclear based on the affidavit and hearing testimony exactly how close in time it was—agents observed a red BMW sedan enter the La Quinta Inn parking lot. The red BMW stopped for around 30 seconds in a parking space, then drove to another parking space near the Altima. Two men, one of whom was defendant, exited the BMW and approached the Altima. Special Agent Farina testified that it was his understanding—though he apparently was not part of this decision-making process—that it was at this point that the decision to arrest was made.

After approaching the car, the defendant got in the Altima's driver seat while the other individual remained nearby outside the car. It was not apparent to the agents observing these events whether defendant ever tried to start the vehicle. After approximately two to three minutes, defendant got out of the car and both men returned to the red BMW. At no point did either man open or even approach the trunk of the Altima.

Agents then arrested both men based on their belief that the men were involved in receiving a shipment of drugs. The agents did not have a warrant. Upon searching the BMW

---

[2] Special Agent Farina testified that this response was listed as unintelligible on a transcript that was made of the calls between the broker and cooperating witness. However, the Court cannot verify this as no transcript was ever provided to the Court.

3

after the arrests, agents discovered a handgun under the driver's seat, a duffle bag containing cocaine, and the key to the Altima. In a subsequent interview, defendant admitted that the gun and cocaine in the bag (as opposed to that in the trunk of the Altima) belonged to him. He indicated to law enforcement that he had been sent to fix the vehicle but denied any knowledge of drug trafficking activity. The other man with defendant was never charged federally.

Defendant now moves to suppress any evidence discovered—including statements made—pursuant to what he claims was an unlawful arrest lacking probable cause.

## DISCUSSION

Under the Fourth Amendment, people are to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. However, a warrantless arrest is still valid if it is supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

The Supreme Court has held probable cause to arrest to mean "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). These "facts and circumstances" must amount to "more than a mere suspicion, rumor, or strong reason to suspect but less than evidence sufficient to convict." *United States v. Williams*, 10 F.3d 1070, 1074 (4th Cir. 1993). To determine whether probable cause exists, law enforcement officers are to consider "the totality of the circumstances" known to the officers at the time of the arrest. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

4

In reaching its conclusion, the Court considered what the agents knew at the time of arrest. The agents knew defendant and another man arrived at the La Quinta in a red BMW around the same time the broker advised the cooperating informant of something—whether the broker advised the cooperating witness that they were at the vehicle or just "there" and the exact timing of these events is unclear from the record before the Court. The agents also knew the red BMW pulled in to the La Quinta parking lot, paused, and then parked near the Altima. Finally, the agents knew that the men got out of the red BMW and approached the Altima.[3]

In reaching its conclusion, the Court also considered what the agents did *not* know at the time of arrest. The agents did not know if a red BMW was the type of car being sent to retrieve the drugs, because cooperating witness did not know. In fact, the cooperating witness—and, thus, the agents—had no description of who or even how many people would arrive to retrieve the drugs. The agents did not know the name Sipriano Moreles-Albear or a description of him. The agents did not even know what the people being sent to the La Quinta were coming there to do: retrieve the drugs or attempt to make the car operational. The agents also did not know if any calls or text messages had been exchanged between the broker and defendant and, if they had, what those communications said. The testifying agent did not know which man, defendant or his unindicted companion, was driving the red BMW. Indeed, the agent who testified at the hearings was not at a vantage point to see the Altima during the relevant time, nor could he provide an estimate of how many cars were in the lot other than to say "multiple." According to the testifying agent, the agents did not even know defendant opened the door and sat in the Altima

---

[3] The Court notes that, at the time of arrest, the agents also knew the men opened the door to the Altima, defendant sat in it for a few minutes, and both men left the Altima and returned to the red BMW without ever opening or even approaching the trunk. However, this does not factor in the analysis as Special Agent Farina testified that the arrest decision was made when the men approached the Altima.

5

for a few minutes at the time the arrest decision was made. Accordingly, agents certainly did not know, once defendant was in the Altima, whether he knew where the key was hidden or simply found it under (or on, as the agent testified at the second hearing) the mat. The agents also did not know if defendant attempted to start the car. Nevertheless, on the information they had when the men approached the Altima, agents decided to arrest the two men based on their belief that the men were involved in receiving a shipment of drugs.

After reviewing the briefing, holding two hearings, and personally questioning the witness, the Court finds that there was not probable cause for the warrantless arrest of defendant. The Court finds that the arresting agents' knowledge was insufficient to establish something more than "a mere suspicion, rumor, or strong reason to suspect." *DeFillippo*, 443 U.S. at 37.

The Court, guided by the language in *Michigan v. DeFillippo*, cannot now find that this belief was "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." 443 U.S. at 37. There was no evidence defendant had committed, was committing, or was about to commit an offense, as he had left the drugs in the car, returned to the car in which he arrived, and appeared to be preparing to leave the scene—and, by extension, the drugs—altogether.[4] All of this, coupled with the all the unknowns discussed above and the possible innocent explanation(s) of defendant's actions, make clear that "a prudent person, or one of reasonable caution" would want more. *DeFillippo*, 443 U.S. at 37.

For example, a person of reasonable caution might request information in advance about who would be coming to the car—even if that information was just how many people and in

---

[4] The Court recognizes that this position could be clouded by the fact that defendant had the key to the Altima with him. However, this fact is immaterial to the probable cause determination, as there has been no evidence whatsoever the agents knew the key was gone from the Altima at the time they made the arrests.

6

what type of car...or even how many people *or* what type of car. A person of reasonable caution might clarify whether the person/people who were coming to the car were coming to retrieve the drugs or attempt to repair the car. A person of reasonable caution might wait to see where the red BMW was going when it left the La Quinta. In short, a person of reasonable caution would want a stronger basis for arrest than the fact that, around the time of a text message saying people were coming to a location, a man approached a car that had drugs in it.

The Fourth Circuit has routinely required more from arresting agents to establish probable cause. The case of *United States v. Dickey-Bey* is especially instructive. 393 F.3d 449 (4th Cir. 2004). In *Dickey-Bey*, law enforcement officers in Maryland were alerted that multiple packages thought to contain cocaine (a suspicion which was confirmed before package delivery) would be arriving in the Baltimore area, including one addressed to "Special Design" at a Towson, Maryland, Mail Boxes Etc. store. *Id.* at 451. Law enforcement staked out the Mail Boxes Etc. location, where one officer went undercover as an employee. *Id.* at 451–52. An actual employee told the officer that the box the package was addressed to was rented to "Lisa Ruiz" but that the usual customer who retrieved the mail from that box was "a black male of average height, about 5'8" or 5'9", with a heavy build" who usually wore a uniform shirt. *Id.* at 452. On the morning of the delivery, about one hour after the anticipated delivery time, a man arrived who fit this description. *Id.* The man entered the store, was identified by the actual employee to be the man who usually retrieved mail from the suspect box, asked for any mail sent to the suspect box, and exited the store with the package containing cocaine. *Id.* Upon exiting the store, the man was arrested. The district court granted defendant's motion to suppress, which was overturned on appeal. On appeal, the Fourth Circuit rejected the district court's apparent concern that defendant could have been an innocent courier.

7

The Court finds that the instant matter is distinguishable from *Dickey-Bey* in several critical ways. First, and importantly, Dickey-Bey had the drugs in his possession when he was arrested. Here, defendant appeared to be in the process of leaving the vicinity of the drugs. In *Dickey-Bey*, the defendant was someone who was known to frequent the mailbox at issue, despite it being registered to a person and business to which he had no known connection. Here, agents had never seen or heard of defendant before he arrived or received a description of him or any involvement in a known drug-trafficking operation. In *Dickey-Bey*, the court of appeals found the sophistication and multiple locations of the drug-trafficking scheme was "inconsistent with a single pickup of a mail by an unknowing carrier." *Id.* at 456. Here, though the operation did reflect a level of sophistication, there was no multiple-location pickup. And, importantly, there was the complicating variable of the car being rendered inoperable and the passage of several intervening hours, thus creating the possibility that an innocent car-repair person would be sent in addition to or instead of the designated drug pick-up person. For all these reasons, the Court finds *Dickey-Bey* distinguishable.

Other Fourth Circuit precedent on the matter is also instructive. Here, for example, the informant was not previously known to the agents. *Cf. United States v. Shepherd*, 714 F.2d 316, 317 (4th Cir. 1983) (informant had provided information on approximately thirty prior occasions). Here, agents had no reason to believe drugs had actually been obtained from a known drug dealer. *Cf. United States v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990) (agents had physical description of suspected drug dealer as well as his physical location and saw defendant leaving the area immediately after a man exited suspected drug dealer's presence with a suitcase, having entered his presence empty-handed). Here, agents did not have a description of the number and race of suspects, as well as the color, style, and state of origin of the car the suspects were

8

driving. *Cf. United States v. Williams*, 10 F.3d 1070, 1076 (4th Cir. 1993) (various witnesses had identified four black males in a white SUV with a certain license plate and state of origin). Here, agents did not have information on the race and location of someone allegedly involved in drug trafficking and did not find drugs in that person's immediate vicinity. *Cf. United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996) (suspected drug dealer was reported to be Asian and his location was known; agents found a bag containing drugs at Asian man at that location's feet). And here, agents did not witness activity consistent with the contemplated crime. *See United States v. Johnson*, 599 F.3d 339, 345-346 (4th Cir. 2010) (subject suspected of drug dealing was witnessed in area known for drug dealing making hasty hand-to-hand contact with multiple people without notable social interaction); *Shepherd*, 714 F.2d 316, 317 (in investigating a moonshine case, agents saw suspect repeatedly carrying plastic gallon jugs to a vehicle's trunk).

For all these reasons, the Court is persuaded that probable cause requires more than what the agents in this case knew at the time of arrest. Here, the strongest evidence the agents had was that the broker reported "they" were there (though where exactly is unclear) around the time (though when exactly is unclear) the red BMW arrived at the La Quinta. However, the broker never indicated who "they" were or what "they" were there to do—which, due to a circumstance of the agents' own making, could have been to attempt to repair the car. Aside from that message, all the agents had at the time they made the decision to arrest was a man who parked near and approached a car. At the time the arrest was actually made, agents also knew the man sat in the car for a few minutes, giving no indication he was aware the car contained drugs, then exited and appeared to prepare to leave the scene and the drugs. The Court cannot find that these events, without more, created probable cause that that man had committed, was committing, or was about to commit a crime.

9

## CONCLUSION

For the reasons above, defendant's motion to suppress is GRANTED. [DE 43]. Accordingly, the evidence, including any statements, obtained by law enforcement officers as a result of the arrest is hereby SUPPRESSED.

SO ORDERED, this **29** day of July, 2016.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE